115 F.Supp.2d 1210 (2000)
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Marlwood Commercial Inc., Omega Group Holdings Ltd., Pine Street Investment Ltd., Pinford Portfolio Inc., Helendale Trading Corp., and Telos Finance Ltd., Plaintiffs,
v.
Viktor KOZENY, Landlocked Shipping Company, Peak House Corporation, and Turnstar Limited, Defendants.
No. Civ.A. 00-B-383.
United States District Court, D. Colorado.
June 12, 2000.
*1211 *1212 Frederick J. Baumann, Alan Wendell Anderson, Thomas John Dougherty, II, Rothberger, Johnson & Lyons, LLP, Denver, CO, Stephen P. Younger, John Andrew Stephenson, Rebecca L. Noonan, Joshua Eli Berstein, Patterson, Belknap, Webb & Tyler, New York City, for plaintiff.
James E. Nesland, Paul Howard Schwartz, Cooley Godward LLP, Denver, CO, for Viktor Kozeny, defendant.
Paul R. Franke, III, Bradley J. Haight, Hall & Evans, Denver, CO, for Landlocked Shipping Co., Peak House Corp., defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
BABCOCK, Chief Judge.
Plaintiffs National Union Fire Insurance Company of Pittsburgh, Pa., Marlwood Commercial Inc. (Marlwood), Omega Group Holdings Ltd., Pine Street Investment Ltd., Pinford Portfolio Inc., Helendale Trading Corp., and Telos Finance Ltd., (collectively, Plaintiffs) move for a preliminary injunction and pre-judgment writ of attachment against Defendants Viktor Kozeny, Landlocked Shipping Company (Landlocke), and Peak House Corporation (Peak House Corp.), to prevent dissipation of Defendants' assets. Plaintiffs assert twenty-one claims against the various Defendants based on an extensive pattern of alleged fraudulent conduct and breaches of fiduciary duty, resulting in a loss of more than $140 million. Based on the following findings of fact and conclusions of law, and after consideration of counsels' statements, briefs, and evidence presented at the May 12, 2000 hearing, I grant the motion for preliminary injunction pursuant to the Colorado Organized Crime Control Act, § 18-17-106(6).

I.

FINDINGS OF FACT

A. Summary of the Case

Plaintiffs invested over $140 million in Azeri privatization vouchers and options through Defendant Viktor Kozeny and The Minaret Group Ltd. (Minaret) and Oily Rock Group Ltd. (Oily Rock). Plaintiffs allege that in making these investments, they relied on representations made by Kozeny that: 1) there would be no markups on the prices of the vouchers and options that they purchased; and 2) the vouchers and options would not be sold out of the inventory of vouchers and options held by Kozeny, his companies or their clients over which he held investment authority. However, acting through offshore companies that Plaintiffs allege Kozeny controlled, Kozeny sold to Plaintiffs options that he had purchased for an average price of less than US$0.40 per option and re-sold them to Plaintiffs for US$25.00 per option. Allegedly, Kozeny directed that a large portion of Plaintiffs' investment funds be transferred to companies that Kozeny controlled, including Defendant Peak House Corp. According to Plaintiffs, these funds were used, in part, to improve, refurbish and maintain real property located in Aspen, Colorado, known as Peak House, the title of which is held by Defendant Landlocked Shipping Company. Plaintiffs contend that Kozeny is the beneficial owner of Peak House.

*1213 B. The Parties

1. Plaintiff National Union Fire Insurance Company of Pittsburgh, PA ("National Union")
National Union is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business in New York, New York. Appendix 1, ¶ 29. National Union, a wholly owned subsidiary of American International Group, Inc. ("AIG") is the parent of Plaintiff Marlwood Commercial Inc. (Marlwood), a limited corporation organized under the laws of the British Virgin Islands. Id.; Plaintiffs' Exhibit C, "DBP1" p. 53. Marlwood was formed for the purpose of investing in Azeri privatization vouchers and options through Minaret and Oily Rock. Appendix 1, ¶ 29.
In May 1998, National Union purchased all of the issued and outstanding shares of Marlwood Commercial Inc. for $15 million. Appendix 1, ¶ 36. The proceeds of the stock purchase were used by Marlwood to invest in Azeri vouchers and options through Minaret and Oily Rock. Id.

2. Plaintiffs Omega Group Holdings Ltd., Pine Street Investment Ltd., Pinford Portfolio Inc., Helendale Trading Corp., and Telos Finance Ltd. (collectively, the "Omega Investors")
The Omega Investors are limited corporations organized under the laws of the British Virgin Islands, and are wholly owned by certain investment funds and accounts managed by Omega Advisors, Inc. (Omega), a New York-based investment manager and advisor. Appendix 3, ¶¶ 20-23, 29, Appendix 4, ¶¶ 5-13. The Omega Investors served as the investment vehicles through which funds and accounts managed by Omega invested more than $126 million in Azeri vouchers and options through Minaret and Oily Rock. Appendix 3, ¶¶ 33-39; Plaintiffs' Exhibit K, "ENV2" pp. 294-428.

3. Defendant Viktor Kozeny
Kozeny, a Czech-born financier, is the principal director and direct or indirect owner of Minaret and Oily Rock, British Virgin Islands limited companies headquartered in Baku, Azerbaijan. See Appendix 5, ¶ 8; Appendix 7, ¶ 4; Appendix 8, ¶ 8. Most of Kozeny's assets are held in the name of companies formed in offshore jurisdictions. Appendix 9, ¶¶ 8, 25-28, 33-47. According to Plaintiffs, Kozeny's assets include a house in Aspen, Colorado known as "Peak House" which was purchased for $19.7 million. Appendix 9, ¶¶ 25-30; Appendix 60, ¶¶ 3-4; Appendix 6; Appendix 53. Although title to the Aspen property is held by defendant Landlocked Shipping Company, Plaintiffs contend that the property is beneficially owned by Kozeny. Id.

4. Defendant Landlocked Shipping Company
Landlocked is a foreign corporation, not authorized to do business in Colorado, which is organized under the laws of the Turks and Caicos Islands. Appendix 9, ¶ 25; Plaintiffs' Exhibit D, "REB6" pp. 107-45. According to documents submitted by Plaintiffs, Landlocked is directly or indirectly controlled by Kozeny and is the holder of the warranty deed for the Aspen property. See Appendix 9, ¶¶ 25-26; Appendices 36-38; Appendix 60, ¶ 4.

5. Defendant Peak House Corp.
Peak House Corp. is a corporation organized under the laws of the State of Colorado with its principal place of business in Palm Beach, Florida. Peak House Corp. was administratively dissolved by the Colorado Secretary of State on December 1, 1999 for failure to file required reports. Plaintiffs.' Exhibit D, "REB6" pp. 174-75. According to Plaintiffs' evidence, Peak House Corp. is controlled directly or indirectly by Kozeny and is the principal manager of the Aspen property. See Appendix 9, ¶ 28; Plaintiffs.' Exhibit D, "REB6" pp. 124-75; Appendix 42, ¶ 4; Appendix 45.

*1214 C. Claims
Plaintiffs bring the following claims against Defendants:

--------------------------------------------------------------------------------
Claim No. Plaintiff Defendants Claim
--------------------------------------------------------------------------------
ONE All ALL COCCA  § 18-17-104(1), CRS
--------------------------------------------------------------------------------
TWO " ALL COCCA  § 104(2)
--------------------------------------------------------------------------------
THREE " KOZENY COCCA  § 104(3)
--------------------------------------------------------------------------------
FOUR " ALL COCCA  § 104(4) Conspiracy
--------------------------------------------------------------------------------
FIVE " LANDLOCKED Aiding and Abetting COCCA  §
 PEAKHOUSE 104(1)(2)(3) and (4) violations
 TURNSTAR
--------------------------------------------------------------------------------
SIX " KOZENY Securities Exchange Act § 10(b)
 SEC Rule 10b-5
 CONTROL PERSON
--------------------------------------------------------------------------------
SEVEN " KOZENY Securities Exchange Act § 20(a)
--------------------------------------------------------------------------------
EIGHT " ALL CIVIL CONSPIRACY
--------------------------------------------------------------------------------
NINE " KOZENY BREACH OF FIDUCIARY DUTY
--------------------------------------------------------------------------------
TEN " KOZENY BREACH OF FIDUCIARY DUTY
 CONFIDENTIAL RELATIONSHIP
--------------------------------------------------------------------------------
ELEVEN " KOZENY TORTIOUS INTERFERENCE WITH
 CONTRACT
--------------------------------------------------------------------------------
TWELVE " KOZENY FRAUD-FALSE REPRESENTATION
--------------------------------------------------------------------------------
THIRTEEN " KOZENY FRAUD-NON-DISCLOSURE OR
 CONCEALMENT
--------------------------------------------------------------------------------
FOURTEEN " Landlocked AIDING AND ABETTING FRAUD
 PEAKHOUSE
 TURNSTAR
--------------------------------------------------------------------------------
FIFTEEN " Landlocked FRAUDULENT TRANSFER
 PEAKHOUSE
 TURNSTAR
--------------------------------------------------------------------------------
SIXTEEN " KOZENY NEGLIGENT MISREPRESENTATION
 CAUSING FINANCIAL LOSS IN A
 BUSINESS TRANSACTION
--------------------------------------------------------------------------------
SEVENTEEN " KOZENY INDUCEMENT OF A BREACH OF
 FIDUCIARY DUTY [MINARET
 AND/OR OILY ROCK]
--------------------------------------------------------------------------------
EIGHTEEN " Landlocked AIDING AND ABETTING A BREACH
 PEAKHOUSE OF FIDUCIARY [OWED BY MINARET
 TURNSTAR AND/OR OILY ROCK]
--------------------------------------------------------------------------------
NINETEEN " ALL UNJUST ENRICHMENT
--------------------------------------------------------------------------------
TWENTY " ALL CONSTRUCTIVE TRUST
--------------------------------------------------------------------------------
TWENTY-ONE " KOZENY ACCOUNTING
--------------------------------------------------------------------------------

D. Privatization Program in Azerbaijan
In 1995, the Republic of Azerbaijan announced a program for the privatization of most state-owned enterprises. Plaintiffs' Exhibit C, "DBP1" pp. 29-30. Under the State Programme of State Privatization in *1215 the Republic of Azerbaijan (the privatization program), the Azeri government began in early 1997 to issue privatization vouchers to its citizens. The vouchers could be "redeemed" for an interest in state-owned enterprises, including major telecommunications and utility companies, Plaintiffs.' Exhibit C, "DBP1" pp. 27, 29-30, 37-46, and the State Oil Company of the Azerbaijani Republic (SOCAR), which controls the bulk of the nation's estimated $9 billion in oil. Id.
The privatization program was open to foreign investors as well as to Azeri citizens. Foreign investors were permitted to purchase and own vouchers, issued in the form of transferable bearer securities and to participate in privatization auctions provided that they first purchased Azeri privatization options from the Azeri State Property Committee (SPC). Plaintiffs' Exhibit C, "DBP1" pp. 31-32.
Four Azeri options were required for a foreign investor to redeem one Azeri voucher at privatization auctions. Id. The SPC initially set the price per option at 2,000 Azeri Manats (AzM), or approximately US$0.50 per option. In October 1997, the SPC raised the price per option to 4,000 AzM, or approximately US$1.00 per option. Id.

E. Kozeny
In or around May 1997, Kozeny formed Minaret, a British Virgin Islands limited company headquartered in Baku, Azerbaijan. Plaintiffs' Exhibit D, "REBI" pp. 1-17. The primary purpose of forming Minaret was to facilitate Kozeny's acquisition, through various corporate vehicles, of a large position in Azeri privatization vouchers. See Appendix 58. Kozeny also formed Oily Rock, a British Virgin Islands limited company, as a vehicle for investing in Azeri vouchers and options. Plaintiffs' Exhibit D, "REB2" pp. 42-61.
Acting through Minaret and Oily Rock, Kozeny began purchasing privatization vouchers soon after the vouchers were issued to Azeri citizens. Kozeny represented to Plaintiffs that by March 1998, he had acquired through Oily Rock nearly two million of the approximately 7.5 million vouchers issued by the Azeri government to its citizens. Plaintiffs' Exhibit C, "DBP1" pp. 27-48, Appendix 29.
By decree of the SPC Chairman dated October 27, 1997, the SPC imposed a substantial increase in option prices, raising the price per option from 4,000 AzM (approximately U.S. $1.00) to 100,000 AzM (approximately U.S. $25.00). The SPC also imposed restrictions on the total number of options that a foreign investor could purchase and hold. Plaintiffs' Exhibit C, "DBP1" pp. 31-32. Shortly before the SPC announced the option price increases in September and October 1997, Kozeny, acting through forty-five foreign shell companies under his control, purchased more than 15.7 million options from the SPC. Appendices 24, 30. According to Oily Rock documents, Kozeny paid less than US$0.40 per option. Id.
At that time, however, Kozeny had only acquired between 1.4 and 1.9 million vouchers, and thus only needed between 5.6 and 7.6 million options to be able to redeem those vouchers at privatization auctions. Id. As a result, Kozeny controlled between 8 and 10 million extra options which he could resell on the secondary market. Id. According to ex-Minaret employee Colin Caomin, Kozeny devised a plan to encourage SPC to raise the option price, which would make his option holdings much more valuable. Appendix 8, ¶ 12.
After acquiring his inventory of Azeri options, Kozeny approached potential investors, including many U.S. citizens, about investing in Azeri privatization vouchers and options. Plaintiffs' Exhibits BB-HH. Kozeny needed foreign investors for two reasons: (1) to sell off his inventory of options and reap the benefit of the SPC's recent increase of the option price; and (2) to achieve a 40% to 50% position in the outstanding vouchers so as to assure him a majority stake in SOCAR should it ever be privatized.
*1216 In December 1997, Kozeny hosted a party at Peak House for various wealthy U.S. citizens. Among the invitees were prominent investors who have homes in Aspen, Colorado. Appendix 10, ¶ 4, Appendix 54, ¶ 4. Shortly after the party at the Aspen property, Kozeny met with various individual investors and offered them an opportunity to participate as co-investors in the acquisition of Azeri vouchers and options. Many of these follow-up meetings occurred in Colorado at the Aspen house. Appendix 10, ¶¶ 5-9, Appendix 54, ¶¶ 5-9.
Kozeny was successful in persuading many of these individuals to invest millions of dollars in the Azeri privatization program through Oily Rock. Among those investing were Colorado-based individuals, who invested directly in Oily Rock. Id.; see also Plaintiffs' Exhibits BB-HH. In addition, Aspen resident Aaron Fleck introduced Kozeny to several of his contacts in New York, one of which was Plaintiff Omega. Appendix 54, ¶¶ 1-12, Appendix 2, ¶ 4.

F. Omega Group
In meetings with Omega in February and March 1998, Kozeny offered Omega an opportunity to participate on an equal and side-by-side basis in the acquisition of one to one and one/half million vouchers and the appropriate number of corresponding options so that together they would be able to secure a majority stake in SOCAR or other attractive state-owned enterprises. Appendix 2 ¶¶ 4-7; Appendix 3, ¶¶ 8-16. Clayton Lewis, the Omega employee in charge of Omega's investments in emerging markets and managing principal of his own investment advisory firm, Pharos Capital Management, L.P. ("Pharos"), led the discussions with Kozeny regarding the Azeri investment on behalf of Omega and his own fund, Pharos. Id.
Omega conducted a due diligence investigation into available information concerning Kozeny and the Azeri investment. During the course of this due diligence, Omega learned of unsubstantiated allegations regarding Kozeny's previous dealings in the Czech Republic, and intended to insure that he would not engage in similar conduct in Azerbaijan. Appendix 35. For example, Omega noted in a due diligence memo that although "critics" had asserted that Kozeny had "benefited at the expense of his shareholders" in his Czech companies "by charging excessive fees and expenses," "[n]o charges ... were ever confirmed against Kozeny and it is important to point out that his original investors['] return[s] to date have been positive." Appendix 35, p. 3. The memo further indicated that Kozeny was regarded as very "smart and visionary" and that the sources whom Omega interviewed about Kozeny would not rule out another investment with him. Id. The sources pointed out that Kozeny was seeking to gain respectability and was "one of the shrewdest investors in central and eastern Europe." Id.
Concerned that neither Kozeny nor any of his companies or clients would seek to profit from Omega's participation in the Azeri investment by selling to Omega vouchers or options that Kozeny or his companies or clients already owned and controlled, Appendix 2, ¶¶ 12-13, 19, Omega and Lewis sought and received assurances from Kozeny that if Omega participated in the Azeri investment, Kozeny and his companies would purchase vouchers and options on behalf of Omega at the best available prices and without any mark-up or commission. He also assured Omega that none of the vouchers or options sold to Omega would be from the vouchers or options held or owned by Kozeny, Minaret or Oily Rock or their affiliates or clients. Appendix 2, ¶¶ 8-9.

1. Letter of Intent
On March 24, 1998, Omega signed a letter of intent (Letter of Intent) with Minaret and Oily Rock concerning the purchase of Azeri vouchers and options pending the execution of definitive agreements. Appendix 2, ¶ 14. The Letter of Intent, among other things, provided that Omega would appoint Oily Rock:

*1217 as its agent to purchase Vouchers on behalf of the Voucher holding companies to be formed by Omega for this purpose (the "Voucher Holding Companies") for prices agreed by Omega Baku [including the Plaintiffs] and Oily Rock in advance, provided, however, that the price paid by Omega Baku for such Vouchers shall be the best price available to Oily Rock and shall in any event not exceed the price paid by Oily Rock for such Vouchers purchased for its own account or the accounts of its affiliates or other clients in similar transactions and at similar times....

Oily Rock will not charge Omega Baku any mark-ups or commissions on the Vouchers purchased for Omega Baku's account, except for those fees, expenses and commissions expressly agreed to by the parties in their Co-Investment Agreement and Custodian Agreement (as defined below). Vouchers purchased by Oily Rock on behalf of the Voucher Holding Companies will be delivered by Oily Rock to Minaret as custodian of the Vouchers for the Voucher Holding Companies pursuant to the terms of a custodian agreement to be negotiated by the parties hereto (the "Custodian Agreement"). None of the Vouchers to be purchased by Oily Rock on behalf of the Voucher Holding Companies will be Vouchers currently owned by Oily Rock or its affiliates or other clients without the prior written approval of Omega Baku.

Plaintiffs' Exhibit C, "DBP1" ¶¶ 5-6 (emphasis added).
By the terms of the Letter of Intent, the term "voucher" included vouchers and options. Id. at 5. The Letter of Intent required Oily Rock to disclose to Omega on a timely basis "all material information in its possession relating, both specifically and generally, to the parties' purchase of Vouchers...." Id. at p. 7. The Letter of Intent further provided that in carrying out its duties under the agreements, "Oily Rock and its affiliates, directors, officers, employees and agents will act for the benefit of Omega Baku [including the Plaintiffs] and the Voucher Holding Companies with all care, skill, prudence and diligence under the circumstances prevailing that a prudent person acting in a similar capacity for its own account or for third parties would use in the conduct of an enterprise of similar character and like aims." Id. at p. 8. The Letter of Intent was signed by Kozeny on behalf of Oily Rock, and by Kozeny and Minaret's managing director, Charles Towers-Clark, on behalf of Minaret. Id. at p.13.

2. Grant Thornton Letter
Before executing the Letter of Intent, Omega was provided with a copy of a March 24, 1998 audit letter from the accounting firm of Grant Thornton SA, Zurich, (the "Grant Thornton Letter"), addressed to another company purportedly controlled by Kozeny, Harvard Capital Management (Worldwide) Limited, Lyford Cay, Nassau, Bahamas, concerning the voucher and option holdings of Oily Rock. Appendix 3, ¶ 25; Appendix 29.
The Grant Thornton Letter accounted for Kozeny's inventory of vouchers and options, and provided a baseline to ensure that Kozeny would not sell his own vouchers or options to Plaintiffs. Appendix 1, ¶ 31; Appendix 3, ¶ 25.
Documents later obtained by Plaintiffs from former Minaret employee Dmitry Vyacheslavovich Podgorny, show, among other things, that the Grant Thornton Letter erroneously reported the number of extra options held by Oily Rock and the price at which they had been purchased. See Appendix 5.
Grant Thornton audit consultant Ian Bryson traveled to Baku in March 1998 to review the books and records of Oily Rock and/or Minaret and to prepare the audit. Appendix 5, ¶¶ 12-14; Appendix 8, ¶ 10. Based on his review, Bryson prepared a chart entitled "OILY ROCK Schedule of Options and Costs," dated March 13, 1998 ("Bryson schedule"). Appendix 5, p. 37. The Bryson schedule reflects that Oily Rock, acting through 45 offshore shell *1218 companies, purchased from the SPC a total of 15,727,000 options for an average cost of less than US$0.40 per option, and that 10,156,000 of the 15,727,000 options were "unused" or "extra"i.e., options not allocated to vouchers. Id. Despite Bryson's findings, the Grant Thornton Letter stated that Oily Rock was holding 300,000 extra options, when it actually held 8 to 10 million extra options. Appendix 29.
Attached to a June 29, 1998 memorandum from Marlies Nievergelt of Grant Thornton to Hans Bodmer of von Meiss were updated financial statements for Oily Rock reflecting over $93 million in income from the sale of options. Appendices 31-32. Nievergelt's memo indicated that although he (Kozeny) "agrees with the calculations," Kozeny did not want to report this income from option sales on Oily Rock's books. Nievergelt's memo also stated, "[a]t the last [Oily Rock] evaluation of March 20, we only showed 300,000 [extra options] instead of approximately 8 million." Appendices 30-31. The memo recorded Kozeny's instruction that Nievergelt should "make sure that these figures are not being disclosed to anybody outside for the time being...." Id.

G. The Agreements
The Omega Investors executed, or through assumption agreements became parties to, an April 30, 1998 Co-Investment Agreement and an April 14, 1998 Custodian Agreement with Minaret and Oily Rock. Appendices 21-22; Appendix 3, ¶¶ 33-34. Kozeny signed both the Custodian Agreement and the Co-Investment Agreement on behalf of Oily Rock and Minaret. Appendix 21-22. The Co-Investment and Custodian Agreements superseded the Letter of Intent. Id.

1. The Co-Investment Agreement
Under the Co-Investment Agreement, the Omega Baku Group, defined therein as including Plaintiffs, appointed the Oily Rock Group, defined as Oily Rock and Minaret, as its non-exclusive agent to purchase Azeri vouchers and options on behalf of the individual members of the Omega Baku Group. Appendix 21, § 2.1.
The Co-Investment Agreement contained various terms governing the purchase of Azeri options and vouchers for Plaintiffs, including Section 2.2, which reads:
2.2 Purchase of Vouchers Oily Rock Group shall identify for Omega Baku Group sources for the purchase of Vouchers [defined as Azeri privatization vouchers and four corresponding privatization options acquired by Omega Baku Group] on behalf of the Voucher Holding Companies at the most competitive prices available in the market for given volumes of Vouchers [and options] and shall cause Minaret, at Omega Baku Group's request, to purchase such Vouchers [and options] on behalf of the Voucher Holding Companies as provided for under the terms of the Definitive Agreements. All purchases of Vouchers [and options] on behalf of the Voucher Holding Companies shall be made at the best prices available to Oily Rock Group and its Affiliates and Clients for given volumes of Vouchers [and options], and such prices shall not exceed the prices paid by Oily Rock Group for such Vouchers [and options] purchased for its own account or the accounts of its Affiliates or Clients in similar transactions and at similar times. Oily Rock Group shall ensure that none of the Vouchers [and options] purchased on behalf of the Voucher Holding Companies shall be purchased from Oily Rock or its Affiliates, or from any of its Clients over which Oily Rock Group exercises investment discretion, unless consented to in writing in advance by Omega Baku Group.

Appendix 21, § 2.2 (emphasis added).
As used in the Co-Investment Agreement, "Affiliate" included any officer, director, general partner or managing director of, for example, Oily Rock or Minaret, which includes Kozeny.
*1219 Section 2.2 prohibited Oily Rock from, inter alia: a) marking up the prices paid for vouchers or options sold to Plaintiffs and b) selling to Plaintiffs any vouchers held by Oily Rock, its affiliates or its client over which it exercised investment discretion. Id.
Co-Investment Agreement Section 6 provided that the sole compensation to the Oily Rock Group for the services rendered under the Co-Investment Agreement was to be a "call option" on a portion of the vouchers held by the Omega Baku Group:
No other consideration or compensation of any kind whatsoever is payable to Oily Rock Group or any of its Affiliates by the Omega Baku Group or any of its Affiliates ... in connection with the transactions contemplated [under the agreement].
Appendix 21, § 6.
Co-Investment Agreement Section 5.1 contains the following prohibition on selling vouchers and options:
Oily Rock Group and its Affiliates ... shall not sell, transfer, pledge or otherwise dispose of Vouchers ... without the prior written consent of the other parties hereto.
Appendix 21, § 5.1.

a. Representations and Warranties contained in the Co-Investment Agreement concerning the purchases of vouchers and options
The Co-Investment agreement contains the following representations and warranties concerning the purchase of vouchers and options for Plaintiffs:
10. Oily Rock hereby represents and warrants that ... (g) the letter, dated March 24, 1998 from Grant Thornton SA to Oily Rock fairly presents in all material respects the consolidated financial position of Oily Rock and the number of Vouchers [and options] beneficially owned by Oily Rock at that time and as of the date hereof, and that all such Vouchers [and options] are owned free and clear of any liens, claims, options, security interests and/or other encumbrances.
* * * * * *
12.1 Material Information Each party hereto shall disclose to the other parties hereto on a timely and continuing basis all material information in its possession relating, both specifically and generally, to the parties' purchase and ownership of Vouchers [and options], their participation in privatization auctions, their ownership and disposition of Portfolio Securities, and all other transactions contemplated by the terms of the Definitive Agreements.
* * * * * *
13.1 Standard of Care In carrying out its duties under the Definitive Agreements, Oily Rock Group shall, and shall cause its Affiliates and their respective officers, directors, employees, agents, partners and members to, act for the benefit of Omega Baku Group and the Voucher Holding Companies with all care, skill, prudence and diligence under the circumstances prevailing that a prudent person acting in a similar capacity for its own account or for third parties would use in the conduct of an enterprise of similar character and with like aims.
Appendix 21 (emphasis added).

2. The Custodian Agreement
Under the Custodian Agreement, Plaintiffs designated Minaret as the central "holder" of all Azeri vouchers and options purchased by and on behalf of the Plaintiffs under the Co-Investment Agreement. Appendix 22. The Custodian Agreement set forth various terms governing the purchase of Azeri vouchers and options for Plaintiffs, including the following:
2.1 Upon receipt of written or oral notice ... from Minaret that it has identified Vouchers [defined as Azeri privatization vouchers and four corresponding privatization options] for purchase pursuant to the terms of the Letter of *1220 Intent and/or the Co-Investment Agreement, as the case may be ... Omega Baku Group [i.e., defined therein as including Plaintiffs] shall have the option of instructing Minaret to purchase such Vouchers [and options] on behalf of the Voucher Holding Companies....
2.3 Minaret hereby agrees to use its best endeavors to purchase such number of privatization options as is required for Omega Baku Group to exercise its rights under each privatization voucher, contemporaneously with Minaret's purchase of such privatization Vouchers [and options] on behalf of Omega Baku Group or as soon as possible thereafter.
10.2 Minaret shall at all times act in the best interests of Omega Baku Group and in accordance with the highest standards of professional conduct and integrity.

10.3 Without limiting the generality of the foregoing, Minaret shall: (a) take all reasonable steps to avoid any conflict of interest between itself and Omega Baku Group....

Appendix 22 (emphasis added).

H. National Union
In late March 1998, Lewis approached National Union regarding the Azeri investment opportunity. Lewis described the investment opportunity to National Union as involving the acquisition of Azeri vouchers by a consortium of investors managed by Kozeny. During these discussions, Lewis repeated to National Union the representations and assurances that Kozeny had made to Omega as described above. Appendix 1, ¶¶ 6-16.
Because of the allegations concerning Kozeny, National Union conducted a pre-investment investigation. Based on an interview with an individual who had known Kozeny for at least four years, National Union concluded that there was "further evidence that supports the representation of investment competency and judgment of Viktor Kozeny." Appendix 34, p. 185. Mindful of Kozeny's reputation, however, in documents from their pre-investment investigation, National Union representatives noted that they had no desire to buy through "Viktor's Broker" and that they wanted to confirm Kozeny's holdings to make sure "this is not a scam to induce buyers into [the] market so he can dump." Appendix 1, ¶ 16; Appendix 32. Therefore, like Omega, National Union required that the representations and provisions of the parties' agreements preclude any mark-up or sale of vouchers or options owned or controlled by Kozeny. See Appendix 1, ¶¶ 13-37.
National Union was given a draft of the Co-Investment Agreement before it was signed and understood it to preclude Kozeny, Minaret and Oily Rock, or any of their affiliates or clients from charging a mark-up on the options and vouchers or from selling vouchers and options held by them or their affiliates or clients. Appendix 1, ¶¶ 21, 26-27. Like Omega, National Union was also given a copy of the Grant Thornton Letter before it invested. Appendix 1, ¶¶ 21, 31.

1. The Agreements Executed by National Union
National Union signed an Investment Agreement with Pharos dated as of June 4, 1998, Appendix 1, ¶ 35, by which it acquired all of the issued and outstanding Class A common shares of stock of Marlwood for $15 million. The proceeds from the stock purchase were to be used by Marlwood to purchase Azeri vouchers and options, to be held in the name of Ridgeway Universal S.A., a wholly owned subsidiary of Marlwood. Appendix 1, ¶¶ 29, 35-36. The actual purchase and custody of Azeri vouchers and options for Marlwood was effectuated by an Assumption Agreement, dated as of June 8, 1998. The Assumption Agreement added Marlwood as a party to the Custodian and Co-Investment Agreements. Under the Co-Investment Agreement, Marlwood became a member of the Omega Baku Group as defined therein. Appendix 1, ¶ 35.

*1221 I. Plaintiffs' Purchases of Azeri Vouchers and Options

1. Omega Investors
Pursuant to the Letter of Intent and Co-Investment Agreement, between approximately March 20, 1998 and July 23, 1998, the Omega Investors purchased, through Minaret, 669,131 voucher booklets for $59,504,471 and 2,676,557 options for $66,913,925. Appendix 3, ¶ 38. To execute these purchases, Omega wired funds in eight separate transactions to one or more Swiss bank accounts maintained by Minaret and its Swiss law firm, von Meiss Blum & Partners ("von Meiss"). Id. at ¶ 39. These transactions were confirmed by Minaret in trade confirmations that were sent by facsimile or mail from Minaret in Baku to Omega in New York. Id.

2. National Union and Marlwood
National Union's $15 million investment in Marlwood stock closed in or around late May or early June 1998. Those funds, in turn, were invested by Marlwood to purchase approximately 81,957 voucher booklets and approximately 328,000 options through Minaret. The options and vouchers were purchased in a series of transactions on June 16 and 17, 1998. Minaret charged Marlwood approximately $85.00 per voucher booklet, or $6,804,280, and approximately $25.00 per option or $8,200,000. Marlwood wired its investment funds to one or more Swiss bank accounts controlled by Minaret and von Meiss. Appendix 27. Those transactions were confirmed by Minaret in trade confirmations sent by facsimile or mail from Minaret to National Union in New York. Plaintiff. Exhibit C, "DBP1" pp. 196-202.

J. Undisclosed Mark-ups and Sales From Inventory
Instead of purchasing options from the SPC, Kozeny directed Minaret to sell to Plaintiffs options that Kozeny had accumulated through a series of offshore shell companies at an average price of less than US$0.40 per option. Appendices 5, 8. Consequently, Plaintiffs paid Minaret approximately US$25.00 per option for options that had been purchased by Kozeny's companies at an average cost of under US$.40 per optionrepresenting a mark-up of over US$24.60 per option.

K. Plaintiffs' Investment Funds
Instead of investing Plaintiffs' funds in options, Kozeny transferred tens of millions of dollars of Plaintiffs' funds to companies around the world. In addition to the Aspen property at issue here, Kozeny transferred Plaintiffs' funds to pay bills on his airplane, to pay his Bahamian lawyer, to invest in holding companies controlling his personal investments and to deposit money in Swiss bank accounts. Appendices 27, 28.
The record reflects over U.S. $9.7 million in wire transfers of Plaintiffs' investment funds from the Swiss bank accounts of Minaret, to companies that were working on or connected to the Aspen property.
These transfers include the following:

Date Recipient Amount
4/28/98 Peak House Corp. $ 500,000
4/28/98 Christensen Design $4,000,000
4/28/98 Turnstar 790,000
6/9/98 Christensen Design $2,500,000
6/17/98 Aspen House Account $1,000,000

*1222
6/17/98 Christensen Design $1,000,000
 __________
TOTAL US$9,790,000

Most of those transfers were designated on Oily Rock's records with the initials "VK." Based on the record, it is a reasonable inference that the initials "VK" stand for Viktor Kozeny. See Appendix 28.

L. Plaintiffs' Discovery of the Undisclosed Mark-Ups

1. Omega Investors
On August 19, 1998, Minaret published in its "Daily Monitor" a summary of the reported proceeds received by the SPC from the entire Azeri privatization program. Omega noticed that the figure for the SPC's receipts from option sales listed in Minaret's "Daily Monitor" was significantly lower than the total amount of money that Omega had paid for its options. See Appendix 3, ¶ 45; Plaintiff. Exhibit K, "ENVI," pp. 36-45.
Omega contacted Tom Farrell ("Farrell"), one of Minaret's two co-Managing Directors, to ask for an explanation. Appendix 3, ¶ 46-47. Farrell purportedly checked with the SPC, and reported back to Omega that the "Daily Monitor" report referred only to those monies received in connection with options redeemed in privatization auctions. Id. At the request of Omega, Farrell obtained from the SPC a letter certifying that various subsidiaries of the Plaintiffs were the registered owners of the options they had purchased and that the official government price for such options had been approximately $25.00 per option since November 1, 1997. Appendix 3, ¶ 47; Appendix 26.
In October 1998, Eric Vincent, an Omega analyst, visited Baku with Kozeny and along with Kozeny met with officials from the SPC. The SPC representatives gave Kozeny a copy of a recently completed report sponsored by the European Union ("the EU Report"), which described the results of the Azeri privatization program to date. Kozeny gave a copy of the report to Vincent. Appendix 3, ¶¶ 51-53. In reviewing the report, Vincent noted that of the 18,375,485 options issued by the SPC as of August 1998, the EU Report indicated that only 45,474 options had been sold at $25.00 per option and that the rest had been sold at between $0.50 and $1.00 per option. Because the Omega Investors had paid $25.00 per option for 2,676,557 options, the EU Report suggested to Vincent that the Omega Investors had acquired their options from parties who had purchased at the lower price. Id.
In November 1998, Omega had the option certificates of the Omega Investors translated from Azeri to English. The majority of the option certificates stated that they were issued to the various subsidiaries of the Omega Investors directly by the SPC between September and October 1997, well before those subsidiaries had been formed and well before the Omega Investors had invested. Appendix 3, ¶ 56.
In February 1999, Vincent returned to Baku and again met with representatives of the SPC. He was informed that the Omega Investors had purchased their options on the secondary market at the direction of Minaret. He was told that the dates on the option certificates represented the dates on which the options, which were later sold to the Omega Investors, had been purchased by Minaret from the SPC. Appendix 3, ¶¶ 58-59. Thereafter, the SPC reissued the option certificates. Id. The newly-issued option certificates indicated that the Plaintiffs had purchased their options from various offshore companies that are listed as Oily Rock "clients" on an internal schedule of Oily Rock vouchers and options. See Appendix 3, ¶ 61; Appendix 23.
In a March 5, 1999 letter from Omega to Kozeny, Omega confronted Kozeny regarding the price paid for the Omega Investors' options and asked that Kozeny meet with Omega to address its concerns. Appendix 4, ¶ 18. Kozeny declined to *1223 meet with Omega, but instead referred Omega to his Florida counsel, L. Frank Chopin. Id. at ¶ 19. Mr. Chopin met with representatives of Omega in April 1999 and conveyed Kozeny's statement that there had been no sales to the Omega Investors from Kozeny's inventory of options. Id.

2. National Union
National Union learned of the EU Report indicating that the total revenue received by the Azeri Treasury from Azeri option sales was approximately $13 million from the sale of approximately 18 million options. Based on those figures, the average sales price of these options was approximately US$0.72 per option, much less than the US$25.00 per option paid by National Union's subsidiary, Marlwood. Appendix 1, ¶ 43. National Union was subsequently informed by former Minaret employee David Bruce Pinkerton, that it was "commonly known" that Kozeny was buying options at around US$0.50 to US$1.00 and re-selling them for US$25.00. Id.
After further investigation, Plaintiffs uncovered evidence they believed indicated that their options had been purchased from companies directly or indirectly owned or controlled by Kozeny. Plaintiffs obtained copies of Oily Rock documents reflecting that the average price Kozeny's companies had paid for those options was less than $0.40 per optionmore than $24 less than the price per option that Kozeny had charged to Plaintiffs. See Appendices 5, 23, 24, 28, 30-31.

M. Custody of the Vouchers and Options
In April 1999, when Omega met with Kozeny's Florida lawyer Frank Chopin, Chopin stated that he believed Kozeny did not intend to stand in the way of Omega taking possession of its vouchers and options and he referred Omega to his partner Jacqueline Miller who was to handle the transfer. Appendix 3, ¶¶ 63-64; Appendix 4, ¶¶ 18-20.
Thereafter, Plaintiffs engaged in lengthy negotiations with Kozeny and his attorneys for the return of their vouchers and option certificates. Minaret ultimately relinquished custody of the vouchers and options on or about September 26, 1999. Appendix 1, ¶¶ 47, 49; Appendix 3, ¶ 63-64. Plaintiffs thereafter commenced legal proceedings against Kozeny and others in London, the Bahamas, B.V.I. and in this Court.

N. Ownership of Peak House
Title to the Aspen property, purchased for cash in June 1997, Appendix 10 ¶ 3, is held in the name of defendant Landlocked, a Turks and Caicos Islands company. The following undisputed evidence establishes Kozeny's use and control over Peak House:
1. Acting through Jacqueline Miller, one of his Florida lawyers, Kozeny gave a security interest in the Aspen property to secure the lease on his Beech King airplane. Appendices 36, 45;
2. With respect to the purchase of Peak House, Kozeny: a) toured the Aspen home several times with a realtor before it was sold; b) told the realtor he was buying the Aspen property; c) made a purchase offer for the Aspen property through his broker; and d) celebrated the purchase at the Aspen home the night the offer was accepted. Appendix 53 ¶¶ 4-9; Appendix 56, ¶¶ 5-6; Appendix 49; Appendix 10, ¶ 13;
3. Before the purchase of the Aspen house closed, Kozeny told Frederic Bourke, an Oily Rock investor, that he was buying the Aspen home; Appendix 10, ¶ 3;
4. Paul Field, the prior owner of the Aspen property confirmed that Kozeny purchased it. Appendix 60, ¶ 4;
5. Kozeny personally ordered and supervised millions of dollars of reconstruction and design work at Peak House including: a) an exercise room given to his wife as a Christmas present; b) a playroom for his children; c) a suite for his female companion; d) a cigar *1224 room dug out of the mountainside; e) construction of secret hiding places; and f) paint colors and shades personally selected and approved by him. Appendix 6, ¶¶ 3-8; Appendix 43; Appendix 61;
6. Kozeny directed Christensen Design Group to acquire and reupholster millions of dollars of furnishings and deliver them to the Aspen home, with the bills to be sent to Turnstar Limited, a company that holds title to one of Kozeny's Bahamas properties. Appendices 56, 61;
7. Accounting records from Minaret, reflect entries designated "VK" [Viktor Kozeny] for millions of dollars in payments made to "Peak House Corp." the "Aspen House Account" and "Christensen Design Group." Appendices 27-28;
8. Kozeny's December 1997 party at the Aspen home was featured in several news articles reporting Kozeny as the owner of that property. Appendix 9, ¶ 25; Appendix 49; see Appendix 10, ¶ 4; Appendix 54, ¶ 4;
9. On various occasions at the Aspen property, Kozeny met with Azeri investors, including various Oily Rock investors and, on one occasion, Omega's chief executive. See, e.g., Appendix 10, ¶¶ 4-5, 9, 11, 15; Appendix 54, ¶¶ 4-6, 12;
10. Kozeny's Florida attorneys, Frank Chopin and Jacqueline Miller of the law firm Chopin & Miller, are designated the attorneys-in-fact for Landlocked and represent Landlocked in lawsuits regarding the Aspen property, as well as representing Kozeny regarding the Azeri investment. Appendix 9, ¶ 26; Appendix 37.
11. Miller signed a deed of trust on the Aspen property and recently signed a proposed lease on the Aspen property. Appendices 36-38; and;
12. One of myriad liens filed against the Aspen property names Kozeny as the obligor and describes him as the resident owner of the Aspen property. Appendix 44. In addition, lawsuits associated with those liens identify Kozeny as the primary contact for Peak House Corp. and Landlocked. Appendix 43.

O. Proposed Sale of Peak House
Beginning around November 1999, the Aspen property was offered for sale through the Aspen real estate firm of Houston & O'Leary. Appendix 9, ¶ 29. Heidi Houston, of Houston & O'Leary, has confirmed that the seller is a wealthy foreign individual although the property is held in the name of an offshore company. Appendix 9, ¶ 30. She has also confirmed that there have been two offers at around $20 million and that the seller wishes to achieve a quick sale. Id.

II.

Summary of Related Proceedings

A. The London Proceedings
Plaintiff Marlwood's claims were first filed in the London High Court on December 17, 1999. The London court found that there is an "obviously strong" case of fraud. Appendix 19, p. 20. As a result, on December 17, 1999, the London court issued a freezing order forbidding Kozeny from disposing of or dealing with his worldwide assets up to US$17 million. Appendix 14. On February 18, 2000, the London court again reviewed the evidence when proceedings were commenced by Omega and an additional freezing order against Kozeny was issued up to US$160 million. Appendix 15. At an April 19, 2000 hearing, the London court repeated its observation that there was "a very strong prima facie case of fraud" which had not been answered by Kozeny. Appendix 20, pp. 1-2; Appendix 59, ¶ 14.

B. The Bahamian Proceedings
On December 17, 1999, Marlwood filed proceedings against Kozeny in the Supreme Court of the Commonwealth of the Bahamas to enforce the London court's freezing order. Based on the same record submitted in London, the Bahamas court issued its own freezing order. Appendix 16; Appendix 58, p.2. On February 25, 2000, the Bahamas court again reviewed the evidence and found it sufficient to issue a *1225 freezing order of up to $160 million based on Omega's having filed its case. Appendix 58., p. 2.

C. The B.V.I. Proceedings
On December 23, 1999, the B.V.I. High Court placed in receivership Minaret and Oily Rock and froze all their assets. Appendix 17.
On January 14, 2000, Kozeny's companies applied to stay the receivership on the following grounds: 1) Plaintiffs had not shown any fraudulent misrepresentations; 2) Plaintiffs allegedly did not rely on Kozeny's representations; 3) the parties' agreements permitted the diversion of Plaintiffs' investment funds, and 4) Plaintiffs were trying to convert contract claims into fraud claims. Appendix 18, pp. 2-3.
In a March 1, 2000 decision, the B.V.I. High Court rejected Defendants' arguments and sustained the receivership order, concluding: "I am satisfied that the Plaintiffs have shown a strong case of fraud on the part of the Defendants. The [receivership and freezing] Orders are necessary for the prevention of the dissipation of the Defendants' assets pending the hearing of the case." Appendix 18, p. 6.

III.

Conclusions of Law
In addition to claims brought pursuant to COCCA and the Securities Exchange Act, Plaintiffs assert multiple claims in equity, including breach of fiduciary duty, rescission, restitution, unjust enrichment, an accounting and the imposition of a constructive trust. (Complaint ¶¶ 155-159, 160-167, 204-208, 209-211, 212-214, b, f and g). Plaintiffs seek a preliminary injunction on five separate theories:
1) COCCA § 18-17-106(6); 2) federal equity power under Fed.R.Civ.P. 65;
3) Colo.R.Civ.P. 102(c) incorporated by Fed.R.Civ.P. 64); 4) principles of comity; and
5) Colorado's fraudulent conveyance statute, C.R.S. §§ 38-8-108(1)(b)-(c).

A. COCCA Injunctive Relief
Pursuant to § 18-17-106(1) and (6), injunctive relief is available for violations of COCCA § 18-17-104 to prevent threatened loss or damage to the Plaintiffs:
(6) Any aggrieved person may institute a proceeding under subsection (1) of this section. In such proceeding, relief shall be granted in conformity with the principles that govern that granting of injunctive relief from threatened loss or damage in other civil cases; except that no showing of special or irreparable damage to the person shall have to be made. Upon the execution of proper bond against damages for an injunction improvidently granted and a showing of immediate danger of significant loss or damage, a temporary restraining order and a preliminary injunction may be issued in any such action before a final determination on the merits
§ 18-17-106(6).
In shaping injunctive relief which freezes assets for the purpose of securing satisfaction of any judgment ultimately obtained, pursuant to Fed.R.Civ.P. 64, I look exclusively to state law. Fed.R.Civ.P. 64; see also FDIC v. Antonio, 843 F.2d 1311, 1315 (10th Cir.1988). Pursuant to Colorado law, I consider six factors in determining Plaintiffs' entitlement to a preliminary injunction:
(1) a reasonable probability of success on the merits; (2) a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; (modified by § 18-17-106(6)); (3) that there is no plain, speedy, and adequate remedy at law; (4) that the granting of a preliminary injunction will not disserve the public interest; (5) that the balance of equities favors the injunction; (6) that the injunction will preserve the status quo pending a trial on the merits.
Colo.R.Civ.P. 65; Kourlis v. District Court, El Paso County, 930 P.2d 1329, 1335 (Colo.1997) citing Rathke v. MacFarlane, 648 P.2d 648, 653-54 (Colo.1982).

*1226 B. Likelihood of Success on the Merits of Plaintiffs' Claims

1. COCCA Claims One through Five
The Colorado Organized Crime Control Act ("COCCA") forbids:
1. Any person who knowingly has received proceeds derived, directly or indirectly, from a pattern of racketeering activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds or the proceeds derived from the investment or use thereof in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise. § 18-17-104(1)(a);
2. any person, through a pattern of racketeering activity or through the collection of unlawful debt, to knowingly acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property. § 18-17-104(2);
3. any person employed by, or associated with, any enterprise to knowingly conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt. § 18-17-104(3); and
4. any person to conspire or endeavor to violate any of the provisions of subsection (1), (2), or (3) of [C.R.S. § 18-17-104]. § 18-17-104(4)
Section 18-17-104(1)-(4).
Under COCCA, a "person" is defined as "any individual or entity holding or capable of holding a legal or beneficial interest in property." Based on the undisputed evidence submitted in this case, I conclude that Defendants Kozeny, Landlocked, and Peak House are "persons" within the meaning of § 18-17-104 and as defined in § 18-17-103(4).
A "pattern of racketeering activity" is defined as "engaging in a least two acts of racketeering activity which are related to the conduct of the enterprise...." COCCA, § 18-17-103(3). As pertinent in this case, "racketeering activity" means "to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit," any conduct defined as "racketeering activity" under § 18-17-103 and (5)(a) and 18 U.S.C. §§ 1961, 1341, 1343, and 1956. See § 18-17-103(5)(a) and (b). Here, there is sufficient evidence to show that Kozeny persuaded Plaintiffs to invest in Azeri vouchers and options based on his assurances, formalized in Custodian Agreements and Co-Investment Agreements, that: 1) Plaintiffs would pay the best available prices for the vouchers and options, without any mark-up or commission; and 2) that none of the vouchers or options sold to them would be from vouchers or options held or owned by him, Minaret, Oily Rock, or their affiliates or clients. See Appendix 2, ¶¶ 8-9; Appendices 1, 21, 22.
Before completing the investment, Omega was provided with a copy of a March 20, 1998 audit letter authored by Grant Thornton SA, a Zurich accounting firm, concerning the voucher and options holdings of Oily Rock, stating, in part:
(1) the activities of Oily Rock started in July 1997;
(2) the lowest price at which Oily Rock had purchased its vouchers was US$11.50 in July 1997 and the highest price was U.S. $98.72 in October 1997;
(3) the majority of Oily Rock's vouchers and options had been purchased "during the past few months in block trades at higher than existing market price"; and
(4) Oily Rock held a total of 1,960,000 vouchers, 7,840,000 "options with vouchers" and 300,000 "extra options" (options not needed to exercise Oily Rock's inventory of vouchers).
Appendix 29. However, other documents reflect that by the end of 1997, Oily Rock held more than 15 million options acquired at less than $.40 per option. See Appendix 5. Furthermore, a June 29, 1998 memorandum from Grant Thornton employee Marlies Nievergelt reflects: 1) $93 million in Oily Rock income from options sales; 2) *1227 Kozeny's agreement with the calculations, although he did not want to disclose the information "to anybody outside," for the time being; and 3) as of March 20th there were only 300,000 options. See Appendix 31.
Under these circumstances, Plaintiffs have made a substantial showing that Defendants, individually or through their agents, engaged in racketeering activity by perpetuating frauds and laundering monetary instruments or funds in connection with the Azeri investment scheme.
In determining the existence of an "enterprise" pursuant to COCCA, I may rely on federal case law construing the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1961, et seq. (1988) because COCCA was modeled after the federal act. See New Crawford Valley Ltd. v. Benedict, 847 P.2d 642 (Colo.App.1993); People v. Chaussee, 847 P.2d 156 (Colo.App.1992), rev. in part on other grounds, 880 P.2d 749 (Colo.1994).
A COCCA enterprise is "an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." See United States v. Rogers, 89 F.3d 1326, 1337 (7th Cir.), cert. denied, 519 U.S. 999, 117 S.Ct. 495, 136 L.Ed.2d 387 (1996); United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (association in fact enterprise includes entities "associated together for a common purpose of engaging in a course of conduct"). The continuity of an informal association, along with differentiation among the roles of its members, can provide the requisite structure. See Rogers, 89 F.3d at 1337; See also United States v. Coonan, 938 F.2d 1553, 1559 (2d Cir.1991) cert. denied, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992) ("Common sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure.")
The enterprise must engage in interstate commerce, or in activities which affect interstate commerce, and function as a continuing unit with an existence beyond that necessary to commit the predicate acts and have an identity distinct from that of the individual Defendants. Gottstein v. National Ass'n For Self Employed, 53 F.Supp.2d 1212, 1219 (D.Kan.1999).
The following evidence supports Plaintiffs' assertion that Defendants are an "association in fact" comprising an enterprise pursuant to COCCA. Kozeny is the principal of Minaret Group Ltd., a British Virgin Islands limited company headquartered in Baku, Azerbaijan that bought and traded Azeri privatization vouchers and options. Podgorny Affidavit, Appendix 5, ¶¶ 4, 8; Caomin Affidavit, Appendix 8, ¶ 6. As principal, Kozeny made all major decisions concerning Minaret's operations and investments. Podgorny Affidavit, Appendix5, ¶¶ 4; Caomin Affidavit, Appendix 8, ¶ 5.
Like Minaret, Oily Rock, a British Virgin Islands limited company, served as a vehicle for the purchase and sale of Azeri privatization vouchers and options. See Plaintiffs' Exhibit C, REB2, pp. 42-61. Oily Rock essentially functioned as Minaret's parent company. Caomin Affidavit, Appendix 8, ¶ 8. Kozeny was involved in the operations of Oily Rock as demonstrated by a March 29, 1999 letter written by him on Oily Rock, Ltd. letterhead to Leon Cooperman, CEO, Omega Advisors, Inc. concerning Omega's Azeri investment. Younger Affidavit, Exhibit D, p. AO 06079.
Minaret and Oily Rock purchased nearly two million Azeri privatization vouchers. Plaintiffs' Exhibit C, DBP1, pp. 27-48; Appendix 29. Specifically, Oily Rock purchased more than 15.7 million options from the SPC for less than $0.40 per option. Appendices 24, 30;
On behalf of Minaret and Oily Rock, Kozeny signed a Co-Investment Agreement and Assumption Agreement between Oily Rock and Omega. Appendix 21. Thereafter, the Omega Group investors purchased 2.6 million Azeri options through Minaret and Oily Rock for US$25.00 per option totaling approximately *1228 US$66.9 million. Id. at ¶ 14; Appendix 5 Exhibit DVP 1. Likewise, through Minaret, Marlwood purchased US$8.2 million dollars worth of options at US$25.00 per option.
Plaintiffs' funds invested with Minaret and Oily Rock are traceable to Defendants. Bank records of Minaret show the following pertinent deposits and transfers:

 Date Amount Transaction
06/12/98 $9 million deposit of Omega Advisor, Inc. funds
06/12/98 $6 million deposit of Marlwood funds
06/17/98 $1,000,016.92 transfer to Christensen Design Group
06/17/98 $1,000,016.92 transfer to The Peak House Corp.
Appendix 27. An Oily Rock record titled "Reconciliation
 of Profit Account" contains the following
 entries:
 Date Text Transfers Transactions
6/15/98 Aspen House Account 1,000,000 VK
6/15/98 Christiansen Design Group 1,000,000 VK
6/7/98 Gulfstream V Aircraft 1,000,000 VK
6/9/98 Christiansen Design Group 2,500,000 VK
4/28/98 Christiansen Design Group 4,000,000 VK
4/28/98 Peak House Corp. 500,000 VK
4/28/98 Dr. Jitka Chvatik/Turnstar 790,000 VK

Appendix 28. Based on the record, it is a reasonable inference that the initials "VK" stand for Viktor Kozeny.
Kozeny's connection to Landlocked and Peak House Corporation is buttressed by the following evidence. Kozeny's Florida attorneys, L. Frank Chopin and Jacqueline S. Miller, are designated the attorneys-in-fact for Landlocked. Appendix 9, ¶¶ 25-26. Miller signed the deed of trust for the purchase of the Aspen property and recently signed a lease on the Aspen property. Appendices 36-38. Peak House Corporation is the principal manager of the Aspen property and possesses authority to enter into contracts on behalf of Landlocked. See Appendix 42, ¶ 4.
In addition, although title to Peak House is held in the name of Landlocked, see Appendix 36, there is substantial evidence that Kozeny is the beneficial owner. Evidence in the record shows that Kozeny: 1) claimed ownership of Aspen House, see Appendix 10; ¶ 3; 2) personally supervised reconstruction and design work at the property, see Appendix 6, ¶¶ 3-8; Appendices 43, 61; 3) directed the Christiansen Design Firm to acquire furnishings and art work for Peak House; see Appendices 56, 61; 4) entertained at Peak House; see Appendices 9, 10, 40, 54; and 5) met with Oily Rock investors and Omega's CEO at Peak House. See e.g., Appendix 10, ¶¶ 4-5, 9, 11, 15; Appendix 54, ¶ 4. In addition, Plaintiffs present evidence that Landlocked, through Kozeny's attorney, Miller, gave a security interest in Peak House to secure the lease on the Beech King airplane used by Kozeny. See Appendices 36, 45.
Based on reasonable inferences from this evidence, I find and conclude that Plaintiffs have made a prima facie showing that Kozeny, Landlocked and Peak House Corp. are an association-in-fact constituting an enterprise within the meaning of C.R.S. § 18-17-104, COCCA. See Rogers, 89 F.3d 1326; Gottstein, 53 F.Supp.2d at 1219.

*1229 1. Ongoing Structure
There is a substantial likelihood that Plaintiffs can show that Kozeny's enterprise is an ongoing structure comprised of at least three entities-Victor Kozeny, Landlocked, and Peak House Corporation-with the common purpose of perpetuating frauds and laundering proceeds in the form of monetary instruments. In addition, each entity has a separate role. Reasonable inferences from the undisputed evidence demonstrate that 1) Kozeny was the principal decision maker of the enterprise and gave directions to the members of the enterprise which were followed by them; 2) Landlocked held title to the Aspen property to conceal Kozeny's interest in it and to conceal the proceeds of the fraud; and 3) Peak House Corp. managed the Aspen property and was used to conceal funds obtained by fraud that were used to pay for construction and maintenance of the Aspen property. Moreover, each entity had a purported independent purpose. Therefore, the Azeri enterprise has sufficient structure to constitute a COCCA enterprise.

2. Interstate Commerce
Evidence reveals wire transfers of funds from Omega to Swiss bank accounts maintained by Minaret, see Appendix 3, ¶ 39, and trade confirmations sent by facsimile and mail from Minaret. Id. The monies derived from Omega were then deposited into Oily Rock's accounts and distributed to Landlocked and Peak House Corp. Thus, there is evidence to conclude, preliminarily, that Defendants used instrumentalities of interstate commerce including the U.S. mails, interstate telephone, and Federal Reserve wire systems to perpetuate frauds and launder monetary instruments or funds as forbidden by §§ 18-17-103(3) and (5)(a) and 18 U.S.C. §§ 1961, 1341, 1343 and 1956.
Based on the circumstantial evidence outlined above, I find and conclude that it is likely that Plaintiffs will prove that, during the period September 1997 through at least September 1999:
1. Kozeny used or invested, directly or indirectly, a portion of the proceeds derived from the pattern of racketeering activity in the acquisition of title to, rights, interests, equity, fixtures, furnishings, personalty or improvements in real property located in Aspen, Colorado, in violation of § 18-17-104(1)(a), C.R.S. See New Crawford Valley, Ltd. v. Benedict, 877 P.2d 1363, 1373 (Colo.App. 1993);
2. Kozeny used or invested, directly or indirectly, a portion of the proceeds derived from the pattern of racketeering activity in the establishment or operation of Landlocked and Peak House Corp., in violation of § 18-17-104(1)(a). Id.;

3. Landlocked and Peak House Corp. used or invested, directly or indirectly, a portion of the proceeds derived from the pattern of racketeering activity in the acquisition of title to, rights, interests, equity, fixtures, furnishings, personalty or improvements in the Aspen property located in Colorado, in violation of § 18-17-104(1)(a). Id.;

4. Kozeny, through the pattern of racketeering activity described above, knowingly acquired or maintained, directly or indirectly, an interest in the Aspen property located in Colorado, in violation of § 18-17-104(2), C.R.S.;
5. Kozeny, through the pattern of racketeering activity described above, knowingly acquired or maintained, directly or indirectly, control of Landlocked and Peak House Corp., in violation of § 18-17-104(2);
6. Landlocked and Peak House Corp., through the pattern of racketeering activity described above, knowingly acquired or maintained, directly or indirectly, an interest in the Aspen property located in Colorado, in violation of § 18-17-104(2);
Further, Plaintiffs are likely to show that:
7. Kozeny, during the period June 1997 to the present, knowingly conducted or *1230 participated in, directly or indirectly, through a pattern of racketeering activity, the affairs of Landlocked and Peak House Corp., and the enterprise consisting of his and their association, including the enterprise's ownership, investment in, and maintenance of certain real property located in Aspen, Colorado, in violation of § 18-17104(3), C.R.S;
8. Kozeny, Landlocked and Peak House Corp., individually and by and through their agents and employees, consciously and knowingly conspired or endeavored to violate the provisions of § 18-17-104(1), (2), and (3) by agreeing, formally or tacitly, or by attempting to participate, directly or indirectly, in the pattern of racketeering activity described herein in violation of § 18-17-104(4), C.R.S. See Salinas v. United States, 522 U.S. 52, 64, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997);
9. As part of this conspiracy, Kozeny, Landlocked and Peak House Corp., individually and by and through their agents and employees, also committed or agreed to commit two or more predicate acts as defined by § 18-17-103(3) and (5)(a) and as more fully described above, with the knowledge that those acts were part of a pattern of racketeering activity;
10. Defendants Landlocked and Peak House Corp., individually and by and through their agents and employees, consciously, knowingly and with the intent to promote or facilitate the violation and racketeering activity, aided, abetted, and/or advised Kozeny's violation of the provisions of §§ 18-17-104(1), (2), (3) and (4). See FDIC v. First Interstate Bank of Denver, N.A., 937 F.Supp. 1461, 1470-71 (D.Colo.1996); and
11. Plaintiffs were directly and proximately injured in their business and property by reason of the acts outline in ¶¶ 1-10 suffering losses estimated to exceed $140 million dollars.
Consequently, Plaintiffs have shown that there is a substantial likelihood that they will prevail on the merits of: 1) Claim one for violations of § 18-18-104(1)(a), COCCA by Kozeny, Landlocked, and Peak House; 2) Claim two for violations of § 18-18-104(2) by Kozeny, Landlocked, and Peak House; 3) Claim three for violations of § 18-18-104(3) by Kozeny; 4) Claim four for violations of § 18-18-104(4) by Kozeny, Landlocked, and Peak House; and 5) Claim five for aiding and abetting Kozeny's violations of § 18-18-104(1), (2), (3) and (4) by Landlocked, and Peak House.

C. Danger of Real, Immediate, and Irreparable injury Preventable by Injunctive Relief
Under COCCA, Plaintiffs need not show irreparable harm to obtain injunctive relief. See § 18-17-106(6).

D. No Plain, Speedy, and Adequate Remedy at Law
The Aspen property is on the market and there have been two purchase offers made. In light of the complexities of this litigation, however, significant time may pass before any judgment will be rendered in this case. If a preliminary injunction does not enter, the proceeds from the sale of Peak House, valued at approximately $19 million, would be beyond the reach of the Court. Thus, any judgment ultimately obtained by Plaintiffs would be of questionable value. Under these circumstances, there is no plain, speedy, and adequate remedy at law available to Plaintiffs.

E. Balance of Equities
If a preliminary injunction issues, Defendants would suffer no significant adverse consequences. At most, Kozeny may lose interest on the proceeds from any sale of the Aspen property. Plaintiffs have, however, posted a $10 million bond in connection with the requested relief. This amount is adequate to protect Defendants from any injury caused by the injunction. Moreover, Plaintiffs state they are willing to allow an arms-length sale or lease of the Aspen property to proceed so long as the proceeds are deposited into this Court. Under these circumstances, in *1231 balance, the threatened Injury to Plaintiffs outweighs any damage the proposed injunction may cause Defendants.

F. Effect of a Preliminary Injunction on the Public Interest; Preservation of the Status Quo
In this case, a preliminary injunction would preserve the status quo. Thus, the public interest would not be adversely affected by such injunctive relief. Rather, because of their lack of assets in the United States, it would be inequitable and against the public interest to allow Kozeny, a foreign citizen and Landlocked, a foreign corporation, to dissipate their assets in the United States and thereby immunize themselves from answering for frauds they are alleged to have committed.
The Colorado Legislature enacted COCCA in order to expand "the sanctions and remedies ... [which] are unnecessarily limited in scope and impact." § 18-17-102. Exercise of the Court's injunctive power is consistent with the expanded remedies provided by COCCA and would further the public interest.
Each of the factors I have considered demonstrate that Plaintiffs are entitled to a preliminary injunction. See Kourlis, 930 P.2d at 1335; Rathke, 648 P.2d at 653-54. Accordingly, I grant Plaintiffs' motion for preliminary injunction pursuant to § 18-17-106(1) and (6) based on violations of COCCA § 18-17-104. Having granted Plaintiffs the relief they seek pursuant to COCCA, I need not address Plaintiffs' alternative grounds.
Accordingly, IT IS ORDERED that:
1. Plaintiffs' motion for preliminary injunction is GRANTED pursuant to the Colorado Organized Crime Control Act, § 18-17-106(1) and (6) as to Defendants Victor Kozeny, Landlocked Shipping Company, and Peak House Corporation; and
2. Bond is set at $10 million dollars.